IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOSEPH L. MCDONNELL,

      Plaintiff,

  v.                                                                  Civil Action 2:16-cv-886
                                                                    Judge Algenon L. Marbley
                                                                    Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff, Joseph L. McDonnell, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying both his Title II Disability Insurance Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed for disability benefits on January 18, 2011, alleging a disability onset date of August 15, 2008. (Doc. 12-5, Tr. 152, 158 PAGEID #: 191, 197). His claims were denied initially on August 11, 2011. (Doc. 12-4, Tr. 95-104, PAGEID #: 133–42). On August 15, 2012, Administrative Law Judge Daniel Cusick held an administrative hearing (Doc. 13-1, Tr. 551, PAGEID #: 594), after which he issued a written decision denying disability benefits on August 24, 2012 (Doc. 12-2, Tr. 6, PAGEID #: 42). Plaintiff sought review of ALJ Cusick's decision, but the decision became final when the Appeals Council denied review on October 29, 2013. (*Id.*, Tr. 1, PAGEID #: 37).

Having exhausted all administrative remedies, Plaintiff filed a Complaint in this Court arguing that the denial of his claims was not supported by substantial evidence. The parties then filed a Joint Motion for Remand, which the Court granted on June 25, 2014, and ordered the case to be remanded with specific instruction to 1) further assess Plaintiff's mental impairments, taking into consideration the mental functional assessment by the consultative psychological examiner, 2) reevaluate Plaintiff's mental residual functional capacity, and 3) obtain supplemental vocational expert testimony if warranted. (Doc. 13-2, Tr. 615, PAGEID #: 650).

Accordingly, a second administrative hearing was held on August 6, 2015, before Administrative Law Judge Jeffrey P. La Vicka ("the ALJ"). (Doc. 13-1, Tr. 519, PAGEID #: 562). The ALJ issued a written decision on August 24, 2015, denying disability benefits. (*Id.*, Tr. 489, PAGEID #: 532). Plaintiff again requested review of the administrative decision to the Appeals Council, which denied his request on July 12, 2016. (*Id.*, Tr. 482, PAGEID #: 525).

Plaintiff filed this case on September 14, 2016 (Doc. 1), and the Commissioner filed the administrative records on November 21, 2016 (Docs. 12, 13). Plaintiff filed a Statement of Specific Errors on January 9, 2016 (Doc. 16), the Commissioner responded on February 23, 2017, (Doc. 18), and no Reply was filed.

### B. Relevant Testimony at the Administrative Hearings

At the beginning of the August 6, 2015 Administrative Hearing, Plaintiff's non-attorney representative stated that Plaintiff's severe impairments included his bipolar disorder, obsessive compulsive disorder, and intermittent explosive disorder. (Doc. 13-1, Tr. 523, PAGEID #: 566). During the hearing, Plaintiff testified that he completed the eighth grade but then quit school to work for the carnival. (*Id.*, Tr. 533, PAGEID #: 576). At the time of the 2015 hearing, Plaintiff

2

stated he had lived alone for the past five years. (*Id.*, Tr. 526, PAGEID #: 569).

Plaintiff testified that he became disabled in 2008 because that's when a psychiatrist and therapist told him to "try to get disability because [he] was not able to deal with society." (*Id.*, Tr. 535, PAGEID #: 578). In his 2012 hearing, Plaintiff explained his alleged impairment: "I can't deal with being around more than one or two people at a time and more than one or two people talking at once, I just get really irritated real easy when I'm around people." (Doc. 13-2, Tr. 577, PAGEID #: 620). In 2013, Plaintiff returned to work for the carnival and his job responsibilities included setting up, tearing down, and running rides, as well as collecting money. (Doc. 13-1, Tr. 536, PAGEID #: 579). However, Plaintiff stated "all [he] could really do is stand there and put a harness on or whatever." (*Id.*).

In terms of daily activities, Plaintiff stated he used to smoke marijuana often with friends, (*id.*, Tr. 542–43, PAGEID #: 585–86); he prepares meals once a day (*id.*, Tr. 543, PAGEID #: 586); goes shopping monthly (*id.*, Tr. 544, PAGEID #: 587); washes the dishes, does his laundry, takes out the trash, and vacuums when necessary (*id.*); takes his daughter swimming or to the playground (*id.*, Tr. 525, PAGEID #: 568); hangs out and plays videogames with friends, whom he sees almost daily (*id.*, Tr. 531, PAGEID #: 574); and sees his niece two to three times a week and spends time with her and her kids (*id.*, Tr. 528–29, PAGEID #: 571–72).

Plaintiff also testified that he applied for and received unemployment benefits, and, at that time, he certified that he was ready, willing, and able to work. (*Id.*, Tr. 533–34, PAGEID #: 577–78). Plaintiff also stated that he put job applications in at grocery stores, fast food restaurants, gas stations, construction, and "anything I could do" but "nobody want[ed] to hire me." (*Id.*, Tr. 534, PAGEID #: 577).

3

### C. Relevant Medical Background

On December 28, 2010, Plaintiff presented to the Belmont Community Hospital Emergency Room complaining of depression, anxiety, and "trouble coping with everyday problems of life," and was subsequently admitted to the psychiatric floor for evaluation and treatment. (Doc. 12-7, Tr. 369, PAGEID #: 410). Treatment notes state Plaintiff was admitted because he was afraid that he would lose control and "end up hurting someone." (*Id.*, Tr. 373, PAGEID #: 414). Upon physical examination, it was noted that Plaintiff was not in distress, he was alert and oriented, had no flight of ideas, and had a normal attention span. (*Id.*, Tr. 369, PAGEID #: 410). While hospitalized, Plaintiff's "behavior was completely appropriate as he related to staff and the other patients," but he did become upset when he found out that his ex-girlfriend's new 19 year-old boyfriend had moved into the house he had shared with her. (*Id.*, Tr. 373, PAGEID #: 414). At discharge, Plaintiff was in a good mood and did not exhibit any mood swings or temper outbursts. (*Id.*). Plaintiff stated he was going to stay with his nephew in Pennsylvania for two to three months until he found another job or returned to the carnival. (*Id.*).

On May 4, 2011, Plaintiff saw Dr. Thomas E. Andrews, Ph.D., for an evaluation. (*Id.*, Tr. 399, PAGEID #: 440). In the treatment notes, Dr. Andrews states that Plaintiff stopped working as a carnival worker in 2009, because his girlfriend had a baby and he decided that he could not travel any more. (*See id.*). At that time, Plaintiff reported he was living with his nephew, his nephew's wife, and their four children. (*Id.*, Tr. 400, PAGEID #: 441). When asked about daily activities, Plaintiff stated that he had been "scrapping a lot lately" and taking junk to the recycling center; he put a lawnmower motor into a dirt bike; completed some welding and other mechanical work, as he described himself as "a very smart person with [his] hands;" and

4

reported talking to his 4-year-old daughter daily.  (*Id.*, Tr. 400–01, PAGEID #: 441–42).  Dr. Andrews noted that Plaintiff was "very talkative," especially about his aggressive tendencies, and "[i]t was necessary to interrupt him often but he tolerated this without [becoming] upset." (*Id.*, Tr. 401, PAGEID #: 442).  Further, Plaintiff was described as being oriented and able to think reasonably and respond accurately.  (*Id.*, Tr. 402, PAGEID #: 443).

Ultimately, Dr. Andrews diagnosed Plaintiff with Bipolar Disorder, with explosive and aggressive episodes, and noted that his prognosis was "fair with continued treatment or improvement in 6 to 12 months."  (*Id.*, Tr. 402–03, PAGEID #: 443–44).  Dr. Andrews opined that Plaintiff was "a strong man and probably very intense and aggressive when he is mildly provoked," yet "[n]one of this was evident in the evaluation."  (*Id.*, Tr. 403, PAGEID #: 444). Dr. Andrews also stated that Plaintiff had "marked" restrictions in interacting appropriately with the public, supervisors and co-workers, as well as "marked" restrictions in responding appropriately to work pressures and changes in a routine work setting.  (*Id.*, Tr. 404, PAGEID #: 445).

On July 10, 2012, Dr. Burton Singerman completed a Mental Residual Functional Capacity Questionnaire for Plaintiff.  (*Id.*, Tr. 478, PAGEID #: 519).  Dr. Singerman noted that Plaintiff suffered from bouts of depression, anger, and constant mood swings, but his prognosis was fair.  (*Id.*).  In terms of work-related activities, Dr. Singerman opined that Plaintiff was severely limited, but not precluded, from accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; responding appropriately to changes in a routine work setting; dealing with normal work stress; interacting appropriately with the general public, and

5

maintaining socially appropriate behavior. (*Id.*, Tr. 480–81, PAGEID #: 521–22). However, Dr. Singerman believed Plaintiff was unable to meet competitive standards when it came to working in coordination with or proximity to others and completing a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*, Tr. 480, PAGEID #: 521). Finally, Dr. Singerman noted that Plaintiff's impairments or treatment would cause him to be absent from work about four days per month. (*Id.*, Tr. 481, PAGEID #: 522).

Plaintiff underwent an interview with Dr. David R. Bousquet on May 28, 2015, at the request of Ohio Disability Determination Department in conjunction with his disability claim. (Doc. 13-6, Tr. 765, PAGEID #: 813). Dr. Bousquet noted at the outset of his June 2, 2015 report that the evaluation was comprised of a clinical interview with Plaintiff and that he reviewed the previous psychological evaluation performed on May 4, 2011 by Dr. Andrews. (*Id.*, Tr. 766, PAGEID #: 814). In the report, Dr. Bousquet states that Plaintiff presented with a neat and clean appearance, was cooperative during the evaluation, did not show signs of anger or irritability, and that he was observed to be distractible but was able to be refocused. (*Id.*, Tr. 769, PAGEID #: 817).

Dr. Bousquet's functional assessment was that Plaintiff was expected to have problems with his abilities to maintain attention and concentration, although the evaluation indicated that he had the ability to perform simple tasks and multi-step tasks. (*Id.*, Tr. 771, PAGEID #: 819). Further, the report states that "available information indicates that from an emotional and psychological perspective," Plaintiff would have difficulties conforming to social expectations in a work setting and responding appropriately to work place stresses and pressures. (*Id.*, Tr. 772, PAGEID #: 820).

6

### D. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012 (the date last insured). (Doc. 13-1, Tr. 495, PAGEID #: 538). At step two of his analysis, the ALJ noted that based on Plaintiff's hearing testimony and other evidence in the record, Plaintiff did in fact work after August 15, 2008, his alleged disability onset date. (*Id.*). In particular, the ALJ noted that Plaintiff testified, and earning records confirmed, that he returned to work for the carnival in 2013 and his yearly earnings totaled $8,005, with evidence that 2013 quarter earnings rose to $4,045 (i.e. average of $1,348 per month). (*Id.*). Monthly earnings of at least $1,040 are presumptive for substantial gainful activity, and thus, the ALJ concluded that there appeared to be time frames during the period at issue in which Plaintiff would not be entitled to obtain benefits based on earnings in excess of substantial gainful activity levels. (*Id.*). However, the ALJ stated that he would afford Plaintiff "the utmost benefit of the doubt," and concluded he had not engaged in gainful activity since the alleged onset date. (*Id.*).

As to step three, the ALJ found that Plaintiff suffered from depression/bipolar disorder, and classified the impairments as severe (*id.*), but found he did not have an impairment or combination of impairments that met or equaled a listed impairment under step four (*id.*, Tr. 498, PAGEID #: 541). The ALJ then extensively discussed why Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04. (*Id.*, Tr. 498–502, PAGEID #: 541–545). Specifically, the ALJ found that Plaintiff had no more than moderate restrictions of activities of daily living (*id.*, Tr. 499, PAGEID #: 542), maintaining social functioning (*id.*, Tr. 499–500, PAGEID #: 542–43), and maintaining concentration, persistence, or pace (*id.*, Tr. 500–

7

01, PAGEID #: 543–44). Moreover, the ALJ noted that the record was devoid of any episodes of decompensation for an extended duration of at least two weeks. (*Id.*, Tr. 501, PAGEID #: 544). The ALJ also noted that these mental limitations were reflected in his opined RFC, which was as follows:

> [T]he claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: should avoid concentrated exposure to extreme cold and heat, wetness and humidity, irritants (i.e., such as fumes, odors, dust, and poorly ventilated areas), and chemicals; should avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; work limited to simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements and few work place changes; and, work should require no interaction with the public and only occasional interaction with co-workers and supervisors.

(*Id.*, Tr. 501–02, PAGEID #: 544–45). In making this determination, the ALJ stated he had given Plaintiff "the maximum utmost benefit of doubt and provided him a range of light exertional work." (*Id.*, Tr. 502, PAGEID #: 545).

The ALJ also found that the activities Plaintiff reportedly engaged in undermined the persuasiveness of the severity of his impairment, symptomatology, and functional limitation alleged. (*Id.*, Tr. 503, PAGEID #: 546). For example, the ALJ noted, *inter alia*, that Plaintiff lived independently; tended to his personal care; socialized with others; prepared simple meals, shopped in stores, and performed household chores; took his child to the playground; and worked during the period in which he alleges he was disabled. (*Id.*).

As to the medical evidence in the record, the ALJ noted that Plaintiff was consistently described as stable with appropriate grooming, hygiene, and dress. (*Id.*, Tr. 505, PAGEID #: 548). Intelligence was not deficient, thought processes were intact, and Plaintiff was described as alert, oriented, and cooperative. (*Id.*). The treatment records all suggest conservative

treatments such as low-dose pharmacological management and monitoring, and the ALJ noted that compliance with treatment was described as irregular. (*Id.*, Tr. 506, PAGEID #: 549). Further, from June 2012 until February 2015, the medical record did not establish any continued treatment by Plaintiff. (*Id.*, Tr. 505, PAGEID #: 548). In sum, the ALJ found that while Plaintiff may have "experienced episodic exacerbations of mental impairment symptomatology, the record failed to prove that the claimant required and sustained critical active treatment or aggressive and significant office care since the alleged onset date." (*Id.*, Tr. 507, PAGEID #: 550).

The ALJ ultimately assigned "some, but less than great, weight" to the state agency opinions of Dr. Andrews and Dr. Bousquet, to the extent that their opinions showed that Plaintiff's ability to perform work requirements was not grossly restricted. (*Id.*, Tr. 508, PAGEID #: 551). Moreover, Dr. Singerman, although noted as a treating source, was assigned "less than great weight" by the ALJ because his opinion was "reasonably undermined by numerous factors and rendered less persuasive." (*Id.*, Tr. 509, PAGEID #: 552).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

In his Statement of Specific Errors, Plaintiff alleges that (1) the ALJ did not provide "good" reasons for rejecting the medical opinions of Dr. Singerman, Dr. Andrews, and Dr. Bousquet[1] (Doc. 16 at 6–9) and (2) the ALJ's RFC finding was not an accurate reflection of all the limitations raised by the record (*id.* at 9–10).

### A. Good Reasons for Rejecting Medical Opinions

Plaintiff argues that Dr. Singerman, Dr. Andrews, and Dr. Bousquet's opinions were substantially supported by the record and that the ALJ's rejection of them was unreasonable. (Doc. 16 at 9). Plaintiff concedes that the ALJ gave reasons for rejecting those medical opinions, but believes they did not qualify as "good reasons," and thus remand is warranted.

#### *1. Dr. Singerman*

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. *Blakley*, 581 F.3d at 406. "One such standard, known as the treating physician rule, requires the ALJ generally to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *Id.* The regulations also require an ALJ to "give good reasons" if weight is not given to a treating physician in the context of a disability determination. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)

---

[1] In Plaintiff's brief, Dr. Singerman is mistakenly referred to as "Dr. Singleton," and Dr. Bousquet is mistakenly spelled "Dr. Bosquet."

10

(citing 20 C.F.R. § 404.1527(d)(2) (2004)).  The opined good reasons "must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406–07 (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *5).  The key purpose for giving "good reasons" is so that a plaintiff can understand the outcome of his case.  *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 624 (6th Cir. 2010).

Here, the ALJ correctly noted that Dr. Singerman was a treating physician but afforded his opinion—that Plaintiff was unable to meet competitive standards when it came to working in coordination with or proximity to others and completing a normal workday without interruptions from psychologically based symptoms—"less than great weight."  (*See* Doc. 13-1, Tr. 509, PAGEID #: 552).  Unlike cases in which the ALJ summarily dismissed a treating physician's opinion though, *see e.g.*, *Wilson*, 378 F.3d at 545, the ALJ provided an accurate and thorough discussion of Dr. Singerman's findings but ultimately concluded they would not be given controlling weight.  That decision was supported by substantial evidence in the record and the ALJ provided sufficiently "good reasons" to comply with the regulations.  *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x. 801, 805 (6th Cir. 2008).

Specifically, the ALJ noted that he had considered the longitudinal record, such as the fact that Dr. Singerman did not frequently treat and examine Plaintiff.  The ALJ also explained that Dr. Singerman did not recommend any crisis intervention or invasive treatment, and instead relied on routine and conservative medical management, despite largely contending that Plaintiff had little to no satisfactory functional abilities—a seemingly inconsistent finding.  Further, Dr. Singerman's treatment records document no inability of Plaintiff to perform activities of daily

living, interact appropriately, or maintain concentration, persistence, or pace, which greatly undermine the extreme social and functional limitations assessed. Finally, the ALJ noted that the daily activities Plaintiff engaged in—particularly the fact that Plaintiff engaged in more than six months of work that involved dealing with the public—during the period at issue did not reflect his symptomatology and description of his impairment. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."). These factors, according to the ALJ, undermined the persuasiveness of Dr. Singerman's opinion.

At base, the ALJ considered Dr. Singerman's opinion but did not believe his findings were supported by anything other than Plaintiff's subjective complaints. Because there was substantial evidence in the record to support the ALJ's decision and he provided good reasons sufficient to explain his decision to Plaintiff, there is no error. *See Brock* v. 368 F. App'x at 625.

*2. Dr. Andrews and Dr. Bousquet*

Both Dr. Andrews and Dr. Bousquet, neither of whom were treating physicians, were afforded "some, but less than great, weight." This, Plaintiff argues, was an error. "In weighing opinions of non-treating sources, Social Security regulations require the ALJ to apply the same level of scrutiny as afforded to treating source opinions." *Hollon v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 577, 584 (S.D. Ohio 2015). In other words, "[s]imply restating a non-treating source's opinion and offering a conclusory assessment, without further discussion, fails to satisfy the requirement that the ALJ provide meaningful explanation of the weight given to all the medical opinion evidence. *Id.* (citing 20 C.F.R. § 416.927(c)).

Dr. Andrews opined that Plaintiff had "marked" restrictions in interacting appropriately

with the public, supervisors and co-workers, and in responding appropriately to work pressures and changes in a routine work setting. In rejecting this portion of Dr. Andrews' opinion, the ALJ noted that this evaluation was remote in nature (i.e., May 2011), and was not reasonably reflective of Plaintiff's level of functioning, especially when considering that Plaintiff reported socializing with friends and family and the reason he left the carnival job was not because of his alleged disability, but instead a result of personal circumstances. Additionally, the ALJ stated that Dr. Andrews appeared to rely heavily on Plaintiff's subjective statements, despite the fact that the mental status findings that were actually observed were not reflective or supportive of any marked impairment in functioning. For example, the ALJ explained that Plaintiff's cognitive functioning was intact, he was alert and oriented, his affect and mood were only mildly impaired, he exhibited no inability to function in a socially appropriate manner, he performed tasks without signs of deficit or difficulty with attention, and persistence and pace were good through the examination. Further, Dr. Andrews noted that Plaintiff's opined issues were not observed at all during the evaluation. Thus, the ALJ thoroughly discussed his reasons for rejecting portions of Dr. Andrews' testimony and no error was committed. *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008).

With respect to Dr. Bousquet's opinion, he stated Plaintiff would have difficulties conforming to social expectations in a work setting and responding appropriately to work place stresses and pressures. While the ALJ noted this opinion was more recent than Dr. Andrews, he explained that it was similarly not reflective of Plaintiff's reported level of functioning. Additionally, the ALJ stated that Dr. Bousquet heavily relied on Plaintiff's subjective statements and his opinion was inconsistent with his own findings. In particular, Dr. Bousquet opined that

Plaintiff had marked difficulty in interacting with others; yet, he noted Plaintiff's ability to get along with extended family members, as being very talkative with the examiner whom he just met, and as able to be cooperative during the examination, including noting no inability to function in a socially appropriate manner. The ALJ also relied on the fact that Dr. Bousquet document Plaintiff's intact concentration, attention, persistence, and pace, as well as his ability to perform simple and multi-step tasks. Thus, here too the ALJ provided good reasons and his decision to rejection a portion of Dr. Bousquet's opinion was supported by substantial evidence.

### B. Plaintiff's RFC

Plaintiff's second argument is that the ALJ failed to incorporate all of his limitations reasonably raised by the record in the opined RFC. (Doc. 16 at 9). Specifically, Plaintiff argues that an appropriate RFC finding would have precluded him from "not only working with or around the public but also with and around co-workers, and limiting supervisory contact to only brief and superficial." (*Id.* at 10). These limitations, according to Plaintiff, would have eliminated most, if not all employment options, and thus a remand is required so that a vocational expert can opine if in fact any employment options exist. (*Id.*)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). Nevertheless, substantial evidence must support the

Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

The ALJ, not a physician, ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio March 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).

Here, the ALJ's RFC was well supported by both medical evidence and Plaintiff's testimony. As noted above, the ALJ appropriately explained the weight given to both the non-treating sources, as well as the treating source, and stated which portions were inconsistent with the record as a whole and thus not considered in the RFC. Within the RFC, the ALJ considered and incorporated Dr. Bousquet's opinion that Plaintiff could perform simple tasks. Further, the RFC limited Plaintiff's work to no interaction with the public and only occasional interaction with co-workers and supervisors. As discussed above, the ALJ explained that he rejected the idea that Plaintiff could not have contact with co-workers or supervisors because treatment notes and Plaintiff's own reported daily activities demonstrate that he behaved and interacted appropriately with his doctors and spent time with friends and family on a consistent basis. Accordingly, the ALJ's discussion and explanation regarding Plaintiff's RFC was sufficient. *See Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 921 (S.D. Ohio 2016) (holding that

ALJs should "explain the weight given" to non-treating sources, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case.") (citing *Williamson v. Comm'r of Soc. Sec.*, No. 1:14–cv–731, 2016 WL 255033, at *8 (S.D. Ohio Jan. 20, 2016)).

The ALJ also considered Plaintiff's testimony in evaluating his RFC, but found his description of his impairment, symptoms, and limitations were not fully credible. (Doc. 13-1, Tr. 510, PAGEID #: 553). The Sixth Circuit has held that the Court must accord great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ expressly questioned Plaintiff's credibility, noting that despite alleging totally disabling impairment, Plaintiff worked during the period at issue and collected unemployment benefits, showing that he held himself out to be able and willing to work during the period at issue, "which is seemingly inconsistent with an individual who alleges an inability to work." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) (holding that "[a]pplications for unemployment and disability benefits are inherently inconsistent.") (citing *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983)).

Accordingly, the "record as a whole" contains substantial evidence to support the ALJ's RFC decision. *See Berry*, 2010 WL 3730983, at *5.

IV.   **CONCLUSION**

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 16) be **OVERRULED** and that judgment be entered in favor of Defendant.

**Procedure on Objections**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: June 21, 2017                                /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE